[Crim. No. 7683. Third Dist. Mar. 21, 1975.]

THE PEOPLE, Plaintiff and Appellant, v.
D. C. SWINNEY, Defendant and Respondent.

**COUNSEL**

Evelle J. Younger, Attorney General, and Gregory W. Baugher, Deputy Attorney General, for Plaintiff and Appellant.

Charles V. Weedman for Defendant and Respondent.

**OPINION**

**FRIEDMAN, J.**—An indictment was filed in Butte County on March 5, 1974. Later, venue was transferred to Sacramento County. Count I charges defendant D. C. Swinney with grand theft of five State of California bonds, taken between June and September 1968. It alleges that "said theft was not discovered until on or about December 15, 1972." Count II charges defendant with concealment of stolen property, committed continuously between October 1968 and March 1974.

The defense moved to dismiss the indictment on the ground that both charges were barred by the three-year statute of limitations. The trial court denied the motion as to count I and granted it as to count II. The People appeal.

## II

The People's appeal charges error in the trial court's dismissal of the

concealment count. As to most felonies, Penal Code section 800 establishes a three-year period of limitations, running from "commission" of the crime. Effective November 10, 1969, section 800 was amended to require prosecution for grand theft "within three years after its discovery."[1] Concealment of stolen property (a crime denounced by Pen. Code, § 496, subd. 1), is within the large class of felonies which must be prosecuted within three years of commission.

Several concepts guide us in reviewing the trial court's dismissal of the concealment count:

■ First: In a criminal case, commencement of the prosecution within the period of limitations is a jurisdictional requisite; the prosecution must allege and prove commission of the crime (or, as the case may be, its discovery) within the period of limitations; the defendant's plea of not guilty puts this allegation in issue and the prosecution has the burden of proving it to the jury. (*People* v. *Crosby* (1962) 58 Cal.2d 713, 725 [25 Cal.Rptr. 847, 375 P.2d 839]; *People* v. *James* (1943) 59 Cal.App.2d 121, 122 [138 P.2d 30].)

■ Second: Because the bar of limitations upon a criminal prosecution is a jurisdictional defect, the evidentiary foundation for the indictment or information must include some evidence that the prosecution is not barred by limitations. (*People* v. *Crosby, supra,* 58 Cal.2d at pp. 724-725; *People* v. *Eitzen* (1974) 43 Cal.App.3d 253, 265 [117 Cal.Rptr. 772]; 52 A.L.R.3d 922, 925.) Lack of that evidence may be asserted, as here, by a motion to set aside the indictment or information; at that point, the court confronts the general rule permitting it to quash only if there is no evidence from which the essential elements of proof can be inferred. (*Rideout* v. *Superior Court* (1967) 67 Cal.2d 471, 474 [62 Cal.Rptr. 581, 432 P.2d 197]; see especially, *People* v. *Eitzen, supra,* 43 Cal.App.3d at pp. 267-268.)

---

[1]Penal Code section 800 has been amended several times since 1969. It now provides: "An indictment for any felony, except murder, voluntary manslaughter, involuntary manslaughter, the embezzlement of public money, the acceptance of a bribe by a public official or a public employee, grand theft, forgery, the falsification of public records, a violation of Section 72, 118, 118a, or 209 of the Penal Code, or Section 1090 or 27443 of the Government Code, shall be found, an information filed, or case certified to the superior court within three years after its commission. An indictment for the acceptance of a bribe by a public official or a public employee, a felony, shall be found, an information filed, or case certified to the superior court within six years after its commission. An indictment for grand theft, forgery, voluntary manslaughter, or involuntary manslaughter, a violation of Section 72, 118 or 118a of the Penal Code, or Section 1090 or 27443 of the Government Code, shall be found, an information filed, or case certified to the superior court within three years after its discovery."

■ Third: The crime of concealing stolen property consists of three elements: (a) the property was stolen, and (b) the defendant concealed or withheld it from its owner, (c) knowing it was stolen. (*People* v. *Williams* (1967) 253 Cal.App.2d 952, 957 [61 Cal.Rptr. 238].) ■ Ordinarily, a thief may not be prosecuted for concealing the stolen property, because —ordinarily—the theft and concealment are parts of a single process. (*People* v. *Marquez* (1965) 237 Cal.App.2d 627, 634 [47 Cal.Rptr. 166].) If on the other hand the thief commits an initial act of concealment and then, at a later time, indulges in new acts of concealment entirely separate from the theft, he may be prosecuted for the later concealment. (*People* v. *Taylor* (1969) 2 Cal.App.3d 979, 984 [83 Cal.Rptr. 119]; *People* v. *Wheeldin* (1969) 276 Cal.App.2d 744, 747 [81 Cal.Rptr. 270].)

Guided by these concepts, we turn to the grand jury transcript: Winifred Maynard, who lived in Gridley, owned five $5,000 State of California bearer bonds, numbered JJ 4511-4515. Attached to the bonds were interest coupons. In June 1968 Mrs. Onetia Baker accompanied Miss Maynard to the Wells Fargo Bank in Gridley, where the latter deposited the bonds. Defendant, county treasurer of Butte County, was a close friend of Miss Maynard. In August 1968 she became ill and defendant took her to the hospital. When Mrs. Baker visited her in the hospital over the Labor Day weekend, Miss Maynard expressed concern over the bonds, stating that she had removed them from the bank and had put them in a safe in her home. On September 2, 1968, defendant and Mrs. Baker brought Miss Maynard home from the hospital. During the previous week defendant had been in Miss Maynard's house quite often, to help maintain the house and to prepare it for her return. Defendant had keys to the house during this period.

When Miss Maynard returned home on September 2, she asked Mrs. Baker to check the safe to be sure the bonds were there. Mrs. Baker looked in the safe and when she saw the envelope which normally contained the bonds, she assumed they were all there. On September 6, just before Mrs. Baker returned to her home in Santa Ana, she removed everything from the safe preparatory to placing the bonds and jewelry in Miss Maynard's safe-deposit box. When Mrs. Baker opened the envelope, she discovered that the five state bonds were missing. She thought that the bonds might have been accidentally thrown away as waste paper, so she did not call the police. After discussing the problem with Miss Maynard, Mrs. Baker wrote to the state Treasurer to report the missing bonds and to inquire about reissuance. The state Treasurer's office received Mrs. Baker's letter on September 10. Mrs. Baker did not discuss the absence of the bonds with defendant at that time.

Miss Maynard died in January 1969, and Mrs. Baker was appointed executrix of her estate. Sometime in February 1969 the state Treasurer's office notified Mrs. Baker that the November 1968 interest coupons from the missing bonds had been cashed. Mrs. Baker asked defendant if he knew anything of the matter. Defendant said that he had received the coupons from Miss Maynard for the purpose of establishing a memorial cross for her deceased sister; that he had gone to Sacramento and had presented the coupons for payment; that he did not have the bonds nor did he know anything about them. Defendant then offered to speak with the state Treasurer about reissuance of the bonds and asked Mrs. Baker to do nothing more about the bonds until he had a chance to complete that errand. Mrs. Baker testified that defendant's explanation seemed "very logical." On April 10, 1970, the state Treasurer issued replacement bonds.

The grand jury received additional testimony that in October 1968 defendant had pledged one of the bonds, number JJ 4512, at the Chico office of the Wells Fargo Bank as security for an existing loan and in November 1968 had pledged bond number JJ 4515 at the Oroville office of the Bank of America as security for a loan. In February 1969 the trust officer of the state Treasurer's office spoke to defendant concerning the coupons presented in 1968; defendant admitted presenting the coupons but denied knowledge of the location of the bonds. In May 1969 Wells Fargo officials suggested to Swinney that they cash unredeemed interest coupons on the bond in their possession. Swinney asked them not to do so.

In June 1970 defendant pledged one of the bonds and in June 1971 two more of the bonds, as collateral for loans owed the First Western Bank at Oroville.

In early 1971 the Bank of America presented one bond coupon to the state Treasurer for payment, noting Swinney's name as the depositor. In March 1971 the state Treasurer returned this coupon with the notation "Payment Stopped." In March 1971 Bank of America officials confronted Swinney with the dishonored bond coupon; the latter made no attempt to explain. The Bank of America personnel demanded and received a new financial statement from Swinney but took no further action.

In February 1972 First Western Bank granted Swinney's request for withdrawal of two bond coupons. In November 1972 the bank manager informed Swinney that he was delinquent in paying interest on the loan

and told him that the bank might have to sell three State of California bonds it held as collateral. Swinney asked the bank manager not to sell the bonds, stating that he had a pending real estate sale which would yield money to pay on the loan. Without notifying defendant, the bank then transmitted the November 1972 coupons to the state Treasurer for payment. When the coupons were returned dishonored, bank officials asked Swinney for an explanation; defendant did not respond. The bank officials then demanded full payment of the loan.

In December 1972 inquiries by the state Treasurer's office elicited information that First Western Bank had possession of three of the missing bonds. Mrs. Baker testified that officials of the First Western Bank told her in May 1973 where the missing bonds were; that not until then did she know their location. The transcript does not reveal when the events were brought to the attention of the law enforcement authorities.

■ The Attorney General argues that concealment of stolen property, like conspiracy, is a continuing crime; that, although a conspiracy is hatched more than three years preceding the prosecution, proof of an overt act within the three-year period prevents the bar of limitations. (*Bompensiero* v. *Superior Court* (1955) 44 Cal.2d 178, 184-185 [281 P.2d 250].) It is unnecessary to characterize concealment as a continuing crime. The evidence here shows more than the passive continuance of a consummated concealment. (Cf. *People* v. *Foogert,* 85 Cal.App.2d 290, 296 [193 P.2d 14].) There is evidence here of affirmative, specific acts of concealment within three years of the March 1974 indictment. In November 1972 Swinney requested First Western Bank to refrain from selling the bonds pledged there, representing that he had prospects of money to pay on the loan. During that same month he refused the bank officials' request to explain the nonpayment of interest coupons which had been presented by these same banks. A trial jury might reasonably infer fresh acts of concealment at that time. Thus, the grand jury transcript contains enough evidence to support a reasonable inference of concealment within three years preceding the indictment. The trial court erred in setting aside count II of the indictment. Its order must be reversed.

## II

Defendant charges trial court error in denial of his motion to set aside the grand theft count. The Attorney General replies that defendant, as respondent in the People's appeal, may not raise claims of error; he

points out that defendant did not seek appellate review of the trial court's order, although Penal Code section 999a permitted him to do so.

■ Commencement of the prosecution within the statutory period of limitations is jurisdictional; hence the accused may assert the bar of limitations at any time, before or after judgment. (*People* v. *McGee* (1934) 1 Cal.2d 611, 613 [36 P.2d 378].) We pass upon the limitation issue as to the grand theft count because the People's appeal results in reversal and the issue will inevitably confront the trial court after the remand. (See *People* v. *Serrato* (1973) 9 Cal.3d 753, 759 [109 Cal.Rptr. 65, 512 P.2d 289]; *People* v. *Jones* (1973) 9 Cal.3d 546, 556 [108 Cal.Rptr. 345, 510 P.2d 705].)

The circumstantial evidence points to the months of August and September 1968 as the time the bonds were lost or stolen. At that time Penal Code section 800 fixed "commission" of grand theft as the starting point for the three-year statute of limitations. Somewhat over a year later, on November 10, 1969, section 800 was amended to specify "discovery" as the event setting the statute in motion. The former statute of limitations upon theft of the bonds had almost two years to run when the statute was amended. ■ The extension of a still operative period of limitations upon a crime does not violate the constitutional ban on ex post facto laws. (*People* v. *Eitzen, supra,* 43 Cal.App.3d at pp. 266-267; *Sobiek* v. *Superior Court* (1972) 28 Cal.App.3d 846, 849-850 [106 Cal.Rptr. 516].)

Defendant's claim of trial court error in denying dismissal of the grand theft count rests on the contention that the period of limitations commenced to run in October 1968, when Miss Maynard and Mrs. Baker discovered that the bonds were missing. The contention requires interpretation of the "discovery" provision of section 800.

A preliminary question—raised but not decided in *People* v. *Eitzen, supra*—is whether "discovery" refers to discovery of the loss or discovery of the crime. Section 800 (fn. 1) declares that "An indictment for grand theft . . . shall be found, an information filed . . . within three years after its discovery." In syntactical terms, "grand theft" is the antecedent of "its." Literally, then, the statute specifies discovery of the grand theft, that is, discovery of the crime as the event triggering the period of limitations. Literally, then, discovery of a loss, without discovery of a criminal agency, is not enough.

Far from answering the problem, literal exegesis stimulates additional questions: "Discovery" imports a state of awareness. One asks whether the statute denotes awareness on the part of the victim, the law enforcement authorities, both or either; at what point in the gamut of awareness—from ignorance through gathering suspicion to complete realization—discovery blossoms; whether reasonable diligence is an ingredient, and if so, whose. At this point we undertake interpretation of the "discovery" provision guided by the need to effectuate its objectives. (Pen. Code, § 4.)

■ The courts presume that the Legislature, aware of judicial decisions, enacts and amends statutes in the light of that knowledge. (*Arnold* v. *Newhall County Water Dist.* (1970) 11 Cal.App.3d 794, 804 [96 Cal.Rptr. 894].) We view the 1969 amendment of section 800 against the background of the statutory and decisional developments preceding it.

In 1927 the Penal Code was amended to collect under the single heading of "theft" a number of common law offenses of a larcenous or fraudulent character. (See *People* v. *Ashley* (1954) 42 Cal.2d 246, 258 [267 P.2d 271]; 1 Witkin, Cal. Crimes (1963) §§ 365-366.) Some of these offenses, embezzlement, for example, were characterized by the victim's unawareness of his loss. In others, such as obtaining property by false pretenses, the victim was aware of the transfer of possession but unconscious of the falsity which prompted it. Faced with these varieties of theft, *People* v. *Darling* (1964) 230 Cal.App.2d 615 [41 Cal.Rptr. 219], held, in effect, that neither kind of unawareness tolled or suspended the three-year period of limitations. The statute of limitations ran from the commission of all thefts, without discrimination between concealed and open thievery.

Another decision, *People* v. *Doctor* (1967) 257 Cal.App.2d 105 [64 Cal.Rptr. 608], construed a Labor Code provision which fixed a one-year period of limitations on prosecutions for nonpayment of wages, running from "discovery" by the state Director of Industrial Relations. The court expressed constitutional dissatisfaction with a penal statute indefinitely suspending the period of limitations on an undiscovered crime; such a suspension was vulnerable as an invasion of the rights to speedy trial and due process. (See *Klopfer* v. *North Carolina* (1967) 386 U.S. 213 [18 L.Ed.2d 1, 87 S.Ct. 988].) The California court equated the nonpayment of wages with fraud; compared the Labor Code provision to the statute requiring civil actions for fraud to be commenced within three years of discovery (Code Civ. Proc., § 338, subd. 4); took note of fraud decisions

imposing on the plaintiff a duty of diligence and demanding pleading and proof of the date of discovery and of the circumstances preventing earlier discovery (see, e.g., *Weir* v. *Snow* (1962) 210 Cal.App.2d 283, 292 [26 Cal.Rptr. 868]); imposed a parallel requirement on prosecutions for violation of the Labor Code provision.

In that state of the law the 1969 Legislature confronted the proposal to amend Penal Code section 800. The problem was two-fold: first, to defer operation of the statute of limitations until a concealed theft came to light; second, to avoid constitutional and policy objections to indefinite deferment caused by indefinitely deferred discovery.

The 1969 proposal was introduced as Senate Bill No. 1154. After passage by the Senate, the bill reached the Assembly floor with a "Do Pass" recommendation from the Assembly Committee on Criminal Procedure. The committee accompanied the bill with a report which, it declared, "will prove helpful in determining legislative intent." The report, printed in the Assembly Journal for July 14, 1969 (p. 6402), is appended in the margin.[2]

Statements in a report of a legislative committee concerning the object and purposes of a proposed amendment which parallel a reasonable interpretation of the amendment should be followed. (*Southern Pac. Co.* v. *Ind. Acc. Com.* (1942) 19 Cal.2d 271, 278-279 [120 P.2d 880].) By equating discovery of grand theft with discovery of fraud, the committee report evinced an intent to insist on discovery of the crime, not merely discovery of the loss, as the operative event. In civil fraud, the victim is aware that he has transferred his property, but unaware of the falsity which prompted it; it is discovery of the *wrong* which galvanizes the statute of limitations. Similarly with grand theft—the amendment could attain its objective of deferring the period of limitations on concealed theft only if "discovery" denoted awareness of the criminal agency causing the loss. Statutory objective, as well as syntax, impels an

---

[2] "REPORT OF THE ASSEMBLY CRIMINAL PROCEDURE COMMITTEE ON SENATE BILL 1154

"In order to indicate more fully its intent with respect to Senate Bill 1154, the Assembly Criminal Procedure Committee makes the following report:

"That bill provides in part that an 'indictment for grand theft shall be found, an information filed, or case certified to the superior court within three years after its discovery.'

"It is the intent of the Assembly Criminal Procedure Committee that the word 'discovery' as it is used in that bill shall be interpreted in the same manner as the word 'discovery' has been interpreted in Section 338 of the Code of Civil Procedure."

interpretation of "discovery" which calls for awareness of the crime, not merely the loss.

By equating discovery of grand theft, a crime, with discovery of fraud, a tort, the Assembly committee sought to inject into the former a body of decisional law preventing indefinite deferment of the statute of limitations. In civil actions for fraud the courts have read into the statute a duty to exercise diligence to discover the facts; the victim must plead and prove facts showing (a) lack of knowledge, (b) that in the exercise of reasonable diligence the facts could not have been discovered earlier, and (3) how and when the victim discovered the fraud. (2 Witkin, Cal. Procedure (2d ed. 1970) Actions, § 339, pp. 1180-1181, quoted in *Casualty Ins. Co.* v. *Rees Investment Co.* (1971) 14 Cal.App.3d 716, 719-720 [92 Cal.Rptr. 857].) Thus, in fraud actions, concealment of the wrong defers but does not indefinitely suspend the statute of limitations. The report of the Assembly Criminal Procedure Committee demonstrates a parallel intent inherent in the 1969 amendment to Penal Code section 800.

Judicial concurrence with the legislative committee's interpretation of Penal Code section 800 stops short of unrestrained embrace of the rules prevailing in civil actions for fraud. Rules of pleading and proof in civil suits are not always appropriate to criminal prosecutions. In applying the fraud concept to grand theft prosecutions, the general principles in fraud lawsuits supply guidance; the minutiae must be viewed with caution. In *People* v. *Doctor, supra,* 257 Cal.App.2d at pages 111-112, the court applied civil fraud rules in a criminal prosecution, declaring: "[T]he accusatory pleading must not only allege the date of discovery of the violation but further allege facts why the violation could not have been earlier discovered in the exercise of reasonable or due diligence." (257 Cal.App.2d at p. 112.)

With all deference to the court which decided *People* v. *Doctor,* we think it was too ardent in embracing civil pleading rules. The *Doctor* pronouncement would demand technical, detailed pleading beyond the requirements of criminal prosecutions. Accusatory pleadings in criminal cases need not be detailed or technical; they may be framed in general terms sufficient to give the accused notice of the essential elements of the prosecution's case. (Pen. Code, §§ 952-953; Witkin, Cal. Criminal Procedure, §§ 186-188.) The indictment or information, as we have noted, must allege facts showing that the prosecution is not barred by limitations. Consistently with the pleading concepts prevailing in crimi-

nal prosecutions, these allegations may be framed in general terms. To satisfy the demands of Penal Code section 800, it is enough to allege that the theft was not discovered until a date within the three-year period; relative to the element of reasonable diligence, it is enough to allege in general terms that in the exercise of reasonable diligence the theft could not have been discovered at an earlier date. Contrary to the *Doctor* case, the "facts" which support the general allegation are a matter of proof, not pleading.

In yet another respect, *People* v. *Doctor* should not be literally pursued in grand theft prosecutions. There the court confronted a statute which fixed "discovery" by a designated law enforcement official as the operative event, regardless of discovery by the victim. In that statutory context, the court declared: " 'Absent a statutory exception, enforcement agencies are required to exercise diligence in discovering the crime within a period calculated from the date of commission even where facts are not so readily discoverable by a third person. . . ." (257 Cal.App.2d at p. 111.)

Transported into a grand theft prosecution, the quoted statement lacks realism. In the ordinary course of events, theft comes first to the knowledge of the victim, only then to the knowledge of the law enforcement authorities. Given the 1969 amendment's objective of suspending the period of limitations on a claim of concealed crimes, the amendment should be construed to set the statute of limitations in motion when the crime is discovered by either the victim or the responsible law enforcement authorities. Generally, it is the victim's reasonable diligence which excuses nondiscovery; official diligence becomes an issue only when suspicion arrives at the door of the officials responsible for the suspect's apprehension and prosecution.

With these interpretive conclusions in view, we turn to the case at bar. We reject defendant's claim that the three-year statute was triggered by Miss Maynard's discovery of the bonds' disappearance in October 1968. At that time the owner discovered a loss of property, but not necessarily a crime. Whether the owner of the bonds should have discovered a crime then or thereafter; the date on which the owner actually discovered the theft; whether, in the exercise of reasonable diligence, the owner could have discovered the crime earlier—these are questions for the trial jury and could not be resolved by the court on a motion to set aside the indictment. Viewed in the light of the evidence before the grand jury, defendant's motion to set aside the grand theft charge was properly denied.

Nevertheless, there remains a question of pleading sufficiency. The indictment alleged that the theft was not discovered until December 1972. It failed to allege that in the exercise of reasonable diligence the theft could not have been discovered earlier. The failure was justified by the lack of decisional law interpreting the discovery provision of section 800. The People should now have an opportunity to amend their pleading to allege that in the exercise of reasonable diligence the theft could not have been discovered earlier. (*People* v. *Doctor, supra,* 257 Cal.App.2d at p. 112.) ▮ Amendment of an indictment is permitted if it does not change the offense charged; an amendment designed to plead compliance with the statute of limitations is permissible. (*People* v. *Crosby, supra,* 58 Cal.2d at pp. 722-723.)

Following the remand the trial court may face the necessity of instructing the jury relative to the grand theft limitations issue. An appropriate instruction might run as follows: "The defendant has raised the defense that the charge of grand theft is barred by the statute of limitations. In California an accused person may be convicted of grand theft only if the theft was discovered within three years before the prosecution was commenced. This prosecution was commenced on      (date)      . If from the evidence you are convinced beyond a reasonable doubt that the defendant committed grand theft, you may convict him of that offense if you find that the theft was discovered at any time within three years preceding that date. You may not, however, convict the defendant of grand theft if you find that, in the exercise of reasonable diligence on the part of the injured person or the criminal law enforcement authorities, the theft should have been discovered at a time more than three years before      (date)      . 'Discovery' does not mean mere awareness of a loss; nor does a mere loss in and of itself suggest a likelihood of theft. 'Discovery' means awareness that the loss was caused by criminal means."

The order dismissing count II of the indictment is reversed and the cause remanded to the trial court for further proceedings consistent with this opinion.

Puglia, P. J., and Paras, J., concurred.